(Nos. 82-CC-0716, 82-CC-0717 cons. )

CONTINENTAL INSURANCE CO. and NORMAN BROTHERS, INC., Claimants, *v*. THE STATE OF ILLINOIS and THE DEPARTMENT OF TRANSPORTATION, Respondents.

*Opinion filed October 23, 1992.*

*Opinion filed August 31, 1993.*

THOMPSON & MITCHELL (MICHAEL D. O'KEEFE, of counsel), for Claimant.

ROLAND W. BURRIS, Attorney General (PHILLIP MCQUILLAN, Assistant Attorney General, of counsel), for Respondents.

## OPINION

Patchett, J.

This is a consolidation of two claims arising out of the same set of facts, that being a collision between a tugboat and a drawbridge on the Illinois River. The first party/Claimant is Norman Brothers, Inc., owner and operator of a tugboat named M/V Marvin E. Norman. The second party/Claimant is Continental Insurance Co., which makes its claim as subrogated insurer to the first party. By stipulation of all parties, hearing in this case has been waived in lieu of briefs submitted by parties. All evidence offered is in the form of witness depositions and the parties' exhibits.

The Respondent, State of Illinois, Department of Transportation, by and through the Attorney General's office, is the owner and operator of the instant bridge, and admits the substantial facts as described in Claimants' brief. Consequently, the Court finds the following to be the material facts of the case:

On May 16, 1980, Claimant, Norman Brothers, Inc., was operating the M/V Marvin E. Norman on the Illinois River near Peoria, with George William Norman acting as captain. At the same time, the Franklin Street drawbridge

was operated by Clarence Johnson under the employment of the State of Illinois, Department of Transportation. Said boat is an all-steel tugboat, consisting of four decks, and is unable to pass under the said bridge while lowered. The bridge was a two-lane bridge with automobile traffic in both directions, as well as pedestrian sidewalks on each side.

Said bridge was a drawbridge which was equipped to raise both halves from the center. Said bridge was controlled by a bridge tender from the bridge house, and was equipped with flashing traffic lights, traffic gates and a traffic siren to warn oncoming cars when the bridge was to be raised. The raising of the said bridge was generally accomplished through the use of switches and levers; however, evidence also showed that the bridge was equipped with override switches which could have been used to raise the bridge if the primary operating system was inoperative. Furthermore, had either method been used, the bridge could have been completely raised within 60 seconds and raised sufficiently to allow the boat to pass under within 20 seconds. The bridge tender, however, had little experience at operating such bridges, no knowledge of the override mechanism, and no supervision.

At the time in question, said tugboat was traveling downstream towards said bridge, pushing eight barges arranged in two rows of four each. As the boat came within one-half mile of said bridge, the boat's pilot, George William Norman, properly notified the bridge tender, Clarence Johnson, that he would need the drawbridge raised.

As the bridge came within sight, it was not raised. It raised as the first two of the boat's eight barges passed under the bridge. Despite the fact that the traffic gates had been lowered, traffic lights were flashing and the

traffic siren had been blown, the bridge still was not raised as the second set of two barges began to pass under. The bridge tender made no effort to contact the boat captain by radio to inform him that the bridge could not be raised. Believing that the main operating system was malfunctioning and would not· raise the bridge, the bridge tender attempted instead to warn the captain at this point by waving his hands.

As the second set of two barges began to pass under the bridge, the captain put the boat into full throttle reverse. Despite this response, the strong current and heavy weight of the boat and barges pulled the boat into the bridge.

As a result of this collision, the M/V Marvin E. Norman was laid up for repairs for 76 days, preventing Norman Brothers, Inc. from operating under a prior contract with American Rivers Transportation Company, and resulting in loss of profits. The fair and reasonable cost to effect the required repairs to Marvin Norman was $258,793.96. Claimant, Continental Insurance Co., as Norman Brothers, Inc.'s insurer, was obligated to pay out this amount for such repairs. Claimant, Norman Brothers, Inc., seeks recovery for lost profits, as well as losses unrecoverable under the insurance contract with Continental. Claimant, Continental Insurance Co., seeks the maximum recovery allowable in this Court, $100,000. Based on these facts, the Respondent does not refute that the State of Illinois, Department· of Transportation was clearly negligent in allowing Clarence Johnson to operate the Franklin Street bridge untrained and with no supervision. Furthermore, the State of Illinois, Department of Transportation was also negligent in not maintaining said bridge in a properly working manner.

While Respondent admits liability, Respondent raises two issues which may affect judgment in this case.

The first of these is Respondent's claim that the State is entitled to a set-off against the Claimant, Norman Brothers, Inc.'s claim in an amount equal to that received by Claimant from Co-Claimant, Continental Insurance Co. This claim is raised pursuant to Ill. Rev. Stat., ch. 37, par. 439.26 which states:

"The granting of an award under this Act shall constitute full accord and satisfaction. There shall be but one satisfaction of any claim or cause of action and any recovery awarded by the Court shall be subject to the right of set-off."

Since Continental has already paid out a sum of $258,793.96 to Claimant, Norman Brothers, Inc., pursuant to its obligations under its insurance contract, such a set-off from the maximum award possible in this Court of $100,000 would completely bar Norman Brothers, Inc. from recovery on its claim for $75,050.64.

In support of this contention, Respondent cites several prior decisions of this Court. The Claimant also cites several prior cases to support its contention that said payment should not entitle the State to a set-off. In fact, this Court has taken conflicting positions on this issue in the past, at times allowing a set-off for any monies received from any source whatever, and at other times only allowing a set-off in instances where monies have been received from a tortfeasor.

These conflicting precedents, however, were put to rest by this Court in the recent case of *Sallee v. State* (1990), 42 Ill. Ct. Cl. 41. The Court noted that, while not explicitly bound to do so by its enabling act, this Court has applied traditional Illinois common law where it does not conflict with the act itself. Such common law includes a "collateral source rule * * * [which] holds that monies received from a source independent of the tortfeasor may not be deducted from damages." (*Peterson v. Bachrodt*

*Chev. Co.* (1978), 61 Ill. App. 3d 898, 378 N.E.2d 618; *Sallee* at 15.) This Court further explained that the logic of such a rule is that "an injured party has prudently entered into an insurance contract and should be allowed to benefit from it * * *. Failure to apply the collateral source rule allows the wrongdoing, throws the burden on the insured, and rewards those without insurance." *Sallee* at 16.

As a result, it is now the policy of this Court to allow set-offs pursuant to section 26 of the Court of Claims Act (705 ILCS 505/26), only when monies received are from the State or another tortfeasor. Since this decision was intended to be "applied prospectively to all claims pending at the time of this decision," (*Sallee* at 16), and since the instant case was filed in 1981 and was pending in 1990 when *Sallee* was decided, the collateral source rule will be applied in the instant case. No set-off shall be allowed to the State.

The second issue raised by the Respondent is in regards to the amount of damages. Claimant, Norman Brothers, Inc., claims a total of $75,050 in unrecovered damages. This sum includes a $5,000 deductible not paid by Continental Insurance, which is clearly recoverable by this Court's precedent as enunciated in *J. E. Vickers v. State* (1958), 22 Ill. Ct. Cl. 659. They also claim the sum of $9,990.12, paid to maintain an engineer on board the M/V Marvin E. Norman. As this claim represents a necessary expenditure incurred in the process of repairing damage to said vessel, this too is properly recoverable from the State. Respondent does not contest this claim.

Respondent does, however, contest Claimant, Norman Brothers, Inc., claim of $60,060.52 in lost profits. Claimant calculated this claim by multiplying the number of days the Marvin Norman was laid up in repairs (76) by

the amount Claimant estimates his profit per day would have been had the Marvin Norman been operational ($790.27 per day).

Claimant supports his claim of $790.27 per day loss with evidence of a contract entered into between the Claimant and American River Transportation Company. The contract provided for $1,850 to be paid to Claimant each day that the Marvin Norman was engaged in work for American Rivers. Claimant estimates, as he may reasonably do with certainty, that the daily costs incurred by him in operating the Marvin Norman would be $939.73 for labor, $90 for food, and $30 for oil. With these expenses subtracted from $1,850, Claimant estimates that he has suffered a net loss of $790 per day for 76 days.

Such calculations are certainly sufficient to meet the requirements of traditional Illinois common law as enunciated in *Klucznik v. Nikitopoulos* (1987), 503 N.E.2d 1147, which stated, "* * * the law does not require a plaintiff to establish lost profits with mathematical accuracy." However, as observed in *Drs. Sellke v. Twin Oaks* (1986), 491 N.E.2d 912, 917, "* * * it is well established that lost profits are not a proper element of damages where proof of these profits is based on speculation or conjecture." Furthermore, "* * * the long-standing rule in Illinois is that lost profits may be a measure of damages where a business is interrupted, but the business must have been established prior to the interruption so that evidence of lost profits is not speculative. [Citations omitted]."

Claimant's contract with American Rivers, which was in effect prior to the collision complained of herein, provided for two levels of payment. As supported by the evidence on record, the instant contract provided that Claimant be paid $1,850 each day that the Marvin Norman was

in operation, resulting in a profit of $790.27 per day. However, the contract also provided, under paragraphs six and seven, for a lower payment of only $500 per day that the Marvin Norman "is laid up for lack of work." Respondent is correct when it points out that this provision demonstrates that the parties contemplated the possibility of a lay-up wherein Claimant would not be receiving $1,850 per day, but instead, only $500 per day.

The Claimant replies by asserting that the Marvin Norman would be actively operating under contract every single one of these 76 days, had the collision not occurred. The Claimant believes this assertion requires no evidence to support it. Instead, Claimant merely asserts that American Rivers would not obligate itself to pay $500 per day for a vessel it did not need unless it was almost absolutely certain the vessel would be used every day, that the Marvin Norman was a big vessel, and that correspondence between American Rivers and Claimant showed that it was unlikely that the vessel would be laid up. Unfortunately, Claimant's assertions miss the boat.

The only evidence on record in this case is an undisputed contract to pay at least $500 per day, and possibly $1,850 should the services of the Marvin Norman be utilized by American Rivers. It is this contractual relationship only which can trace its establishment to a point in time prior to the instant collision as required per *Drs. Sellke et al.* This contract alone, according to Claimant's own assertions, only entitles Claimant to $500 per day. In order for Claimant to be entitled to $790.21 in profit per day, Claimant must be engaged in active duty on behalf of American Rivers. Presumably, this would have been reflected in some form of work order, or similar request for performance, by American Rivers. No such request has been introduced as evidence into the record. At best, Claimant

might argue that he was in the middle of one such task when the collision occurred. However, no evidence has been offered to establish how long this job would have taken.

As a matter of fact, one can only speculate what American Rivers would obligate itself to do. At best, therefore, Claimant can speculate that American Rivers would have actually requested 76 days of continuous service, and that the Marvin Norman would have been able to provide 76 days of continuous service. To base an award upon such speculation would be pure conjecture. It would violate both the traditional common law and precedent in *Sioux City et al. v. State* (1978), 32 Ill. Ct. Cl. 603. In *Sioux City*, the Court received evidence that Claimant's "losses resulting from the deprivation of the use of the Waverly amounted to $800 per day." The Court found, however, that this figure was "somewhat uncertain," and thus refused the claim of $800 per day, instead awarding $500 per day.

Given that the Claimant in the instant case had made an even less than "somewhat uncertain" showing of evidence regarding lost profits than the claimant in *Sioux City*, this Court will refuse a $790.27 per day award. Instead, we award the amount which is derived from the only relationship clearly established in the record, $500 per day.

As for the claim of the Claimant, Continental Insurance, this Court has repeatedly recognized the claims of subrogated insurers such as in *Lester R. Borum & Emmco Insurance Co. v. State* (1969), 26 Ill. Ct. Cl. 328, 332 and *Vickers* (1958), 22 Ill. Ct. Cl. 671.

Therefore, we award the Claimant, Norman Brothers, Inc.:

| Insurance Deductible | $ 5,000.00 |
| Engineer on Board/Repair | 9,990.12 |
| Lost Profits: 76 days @ $500.00 per day | 38,000.00 |
| Total | $52,990.12 |

and Claimant, Continental Insurance, $100,000.

## OPINION

PATCHETT, J.

This claim arises out of a tugboat accident which occurred March 16, 1980, on the Illinois River. A tugboat, named M/V Marvin E. Norman, collided with a drawbridge. Norman Brothers, Inc., was the owner and operator of the tugboat. Continental Insurance Co. makes a claim as subrogated insurer to Norman Brothers, Inc. The hearing was held April 6, 1987, and in September 1987, a brief was filed by the Claimant. The Respondent filed a brief in November 1987. The case was transferred to a new commissioner in September 1989. A recommendation by that commissioner was filed July 12, 1992. Oral argument was held January 29, 1992. An opinion was filed October 23, 1992.

In that opinion, this Court granted Claimant, Norman Brothers, Inc., $52,990.12, and Claimant, Continental Insurance Co., the sum of $100,000. The Respondent filed a motion for a new hearing on the issue of whether or not the subrogation claim was a separate claim from that of the owner of the tugboat, and on a closely-related issue as to whether the jurisdictional limit of $100,000 in tort actions would apply to this case.

The first issue that the Court must consider on the motion for rehearing is whether the two causes of action in this case are actually one claim, because Continental

Insurance Company comes before this Court as a subrogee. If these actions are one claim, or if they constitute a recovery to or for the benefit of Norman Brothers, Inc., in excess of $100,000, then the award should be modified to apply the jurisdictional limit. If, regardless of how they are labeled, how the claims are brought, or in whose name, they are separate claims, or they are not to, or for the benefit of Norman Brothers, Inc., then, the jurisdictional limit will not be applied.

It is clear that in prior cases before this Court, we have consistently allowed recovery by both a claimant and the claimant's insurance company as a subrogee. In *Borum & Emmco Insurance Co. v. State* (1969), 26 Ill. Ct. Cl. 328, we allowed a truck owner and his insurance company to both recover from the State because of the negligence of the State. In *J. E. Vicker & F. N. Byrn, Co-partners, d/b/a Delta Towing Company & Westchester Fire Insurance Company v. State* (1958), 22 Ill. Ct. Cl. 659, a case with strikingly similar facts, we allowed the towboat owner, and the owner's insurance company to both recover their respective losses as the result of the damages. However, the jurisdictional limit set forth by statute was not an issue in those cases.

The jurisdiction of the Illinois Court of Claims is provided in part by section 8 of the Court of Claims Act. (705 ILCS 505/8.) Norman Brothers, Inc.'s claim clearly sounds in tort. The jurisdictional limit on such actions is clearly set at $100,000. The precise wording of that section of the statute is clearly controlling in the present case. It states "that an award for damages in the case sounding in tort, * * * shall not exceed the sum of $100,000 to or for the benefit of any claimant."

This Court refused to exceed a single $100,000 payment when we granted $100,000 to the administrator of

an estate in a wrongful death action, but refused to pay the additional funeral bill of $2,409.50 because the total would have exceeded the jurisdictional limit previously alluded to. (*Peterson v. State* (1984), 37 Ill. Ct. Cl. 104.) It is worthwhile to note that in the *Peterson* claim, despite the fact that the decedent left a widow and two children, the administrator filed a claim for wrongful death and claim for funeral expenses. In a case decided in 1989, *Copland v. State* (1989), 41 Ill. Ct. Cl. 125, this Court awarded the full $100,000 maximum award to the estate of the decedent, and additional $100,000 maximum awards to the father, mother, and sister of the deceased. Each of the family members brought individual claims in that action as well as the action of the special administrator of the estate. Clearly applying the *Copland* rationale to the *Peterson* case, this Court could at the present time award a maximum award to the administrator of an estate, as well as additional awards to family members making a claim under the wrongful death action. This Court has never before reached the issue of whether each claim must be brought in a separate name in order to be able to reach this result. A requirement such as that would seemingly place form over substance. So long as the maximum jurisdictional amount of $100,000 is not exceeded to, or for, the benefit of a single claimant, the statute is complied with. This Court has clearly ruled that in wrongful death situations, the claim of the estate and the claim of surviving family members are not to be considered to or for the benefit of the same claimant, even though surviving family members are almost certainly the beneficiaries of the estate's recovery. The award to the surviving family members for loss of society is clearly separate from the award made to the estate for pre-death pain and suffering, hospital, and funeral expenses. The claims of the family members are not derivative of the

estate, nor is the claim of the estate derivative of that of the family members.

The Claimant pointed out in his reply to the motion for rehearing that the statute governing the Court of Claims allows the Court of Claims to establish rules. The Court of Claims has pursuant to that statutory authority adopted rules; however, none of those rules directly apply to the present situation. In addition, the Civil Practice Act shall apply to the proceedings before the Court of Claims except where that act would be in conflict with specific rules already adopted by the Court of Claims. The Claimant has pointed out that section 2—403(c) of the Code of Civil Procedure (735 ILCS 5/2—403(c)), states that any action brought by virtue of the subrogation provisions of any contact, or by virtue of subrogation by operational law shall be brought either in the name or for the use of the subrogee. We feel that this provision clearly applies to the Court of Claims, but only governs the manner or name in which the claim may be brought, and does not govern whether or not the claim of the insurance company is a separate claim from that of the tugboat owner for purposes applying the $100,000 jurisdictional limit.

After this Court granted the motion for rehearing and heard oral argument on the issues addressed in this opinion, the Court allowed the Claimant and Respondent to file for such additional authorities or memorandum of law as they desired. Claimants filed a supplemental memorandum of law which argued in part that by the very language of the statute setting forth the jurisdictional limit, specifically that part which refers to "* * * if a like cause of action would lie against a private person or corporation in a civil suit" would qualify the insurance company in this case as a claimant. We think, based on prior cases of this Court

which have considered the question of whether or not an insurance company bringing a subrogation action is a claimant, the language of the jurisdictional limit statutes set forth above, and the argument of the Claimant, that in fact the subrogation action brought by Continental Insurance Company is a separate claim.

The question remains, however, whether or not money paid to Continental Insurance Company as a subrogee violates that portion of the jurisdictional limit statute which says that this Court cannot pay more than $100,000 to or for the benefit of a single claimant. Since the subrogation claim is derivative of the claim by Norman Brothers, Inc., can we exceed a single $100,000 payment, regardless of whether it involves one claim or two, or one claimant or two claimants? Any payment made to Continental Insurance Co. would arguably be for the benefit of Norman Brothers, Inc., even if it was a separate claim made payable to a separate claimant.

Black's Law Dictionary defines behalf as benefit, support, defense, or advantage. Since paying Continental Insurance Co. might not create a present advantage or benefit to Norman Brothers, Inc., we must further examine the basis of subrogation. As cited by the Respondent in his brief, the case of *Aupperle v. American Demnity Co.* (1979), 75 Ill. App. 3d 722, 31 Ill. 3d 523 holds that the subrogee can have no greater right than a subrogor, and can enforce only such rights as a subrogor could enforce. That court held when a subrogor waived his right to mechanics' lien, the subrogee's rights in that regard were likewise waived. The supreme court of Illinois in *McCormick v. Zander Reum Co.* (1962), 25 Ill. 2d 241, 184 N.E.2d 882, established the rule cited above. In so doing, they held that a non-negligent employer could not seek reimbursement from a third party because the

employee himself at that point could not assert the claim. Similarly speaking, if Norman Brothers, Inc., would have a right under the Court of Claims statute to only $100,000, how could Continental Insurance Co. enforce rights in excess of that?

Finally, the appellate court of Illinois in the case of *Reich v. Tharp* (1988), 167 Ill. App. 3d 496, 118 Ill. Dec. 248, in a well-reasoned opinion regarding many issues involving subrogation, held that a subrogee can have no greater rights than the subrogor, and the subrogee must step into the shoes or be substituted for the subrogor. In addition, that court held that a subrogor must possess a right that he can enforce against the third party, and the subrogee must seek to enforce the subrogor's right. There is absolutely no doubt that if there was not a jurisdictional limit in the Court of Claims, Continental Insurance Co. would be able to pursue recovery against the State of Illinois because in good conscience, the State of Illinois is responsible for the damage in question. But if Continental Insurance Co. must stand in the shoes of Norman Brothers, Inc., it would appear to be clear that the $100,000 jurisdictional limit would prohibit a recovery in excess of that sum.

In summary, ultimately then the controlling issue in this claim is not whether or not there are multiple claims, or separate claims, or separate claimants, but whether or not a subrogation action, which will result in an aggregation of the awards of more than $100,000 violates that part of the jurisdictional statute cited above which prohibits awards and tort cases in excess of $100,000 to or for the benefit of any claimant. It is clear from reviewing the applicable law that subrogation actions are by their very definition to or for the benefit of the subrogor. Therefore, we hold that the position taken by the Respondent in the

motion for rehearing should be upheld, and the total award in this claim will be reduced to $100,000.

It then remains for this Court to decide what each of the Claimants should receive. The subrogation action is derivative, therefore, the underlying claim of Norman Brothers, Inc., should be given preference. Therefore, we award Norman Brothers, Inc., the sum of $52,999.12, and we award Continental Insurance Company the sum of $47,000.88.